

Cite as 2013 Ark. 510

# SUPREME COURT OF ARKANSAS

No. CV–13–449

| | |
|---|---|
| FORD MOTOR COMPANY<br>APPELLANT | **Opinion Delivered** DECEMBER 12, 2013 |
| V. | APPEAL FROM THE JEFFERSON COUNTY CIRCUIT COURT [NO. CV-2003-627-1] |
| PAULETTE R. WASHINGTON, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF JOHNNY RAY WASHINGTON, DECEASED, AND AS PARENT AND LEGAL GUARDIAN OF TERIAN WASHINGTON, A MINOR<br>APPELLEE | HONORABLE BERLIN C. JONES, JUDGE<br><br>AFFIRMED IN PART; REVERSED AND REMANDED IN PART; MOTION TO STRIKE REPLY ARGUMENT DENIED. |

**CLIFF HOOFMAN, Associate Justice**

Appellant Ford Motor Company ("Ford") appeals from the judgment entered against it following a jury trial in Jefferson County Circuit Court. Ford presents five points of error on appeal: (1) whether the circuit court abused its discretion in refusing to admit evidence of seat belt noncompliance pursuant to Arkansas Code Annotated section 27-37-703 (Repl. 2008); (2) whether the circuit court erred as a matter of law in determining that the defective-glass claim was not preempted by Federal Motor Vehicle Safety Standard 205 ("FMVSS 205"), 49 C.F.R. § 571.205 (2001); whether the circuit court erred in denying Ford's motion for judgment notwithstanding the verdict on the issue of punitive damages; (4) whether the circuit court erred in failing to reduce the jury's compensatory-damages award, pursuant to Arkansas Code Annotated sections 16-61-204 and –205 (Repl. 2005), before entering



judgment for Washington; and (5) whether the nunc pro tunc designation included in the circuit court's judgment is contrary to Arkansas law. We simultaneously consider with the submission of this case a motion filed by Washington during the pendency of the appeal to strike a portion of Ford's reply brief. We affirm in part, reverse and remand in part, and rule that the motion is denied.

At approximately 10:30 a.m. on August 23, 2000, Johnny Ray Washington and his eleven-year-old son, Terian, were traveling in their 1994 Ford Explorer on Linden Street in Pine Bluff, Arkansas, when the vehicle was struck on the driver's side by Karah Allen Williams, who had run a stop sign. The Explorer rolled over twice and landed right-side up. Terian walked away from the accident, but Johnny suffered a fatal head injury when his head exited the vehicle during the rollover and was crushed. When emergency-medical technicians arrived on the scene, Johnny was in severe distress but still had a pulse and slow respirations. Johnny was transported to Jefferson County Regional Medical Center, where he was pronounced dead at 11:39 a.m.

On August 14, 2003, appellee Paulette R. Washington, the decedent's wife, individually and as administratrix of her husband's estate, and as parent and legal guardian of Terian Washington, filed a complaint in the Jefferson County Circuit Court against Ford Motor Company ("Ford"), Freeway Ford Lincoln Mercury, Inc., and Karah Allen Williams.[1]

---

[1] Washington entered into a settlement-and-release agreement with Williams on August 7, 2006, and the circuit court entered an order dismissing all claims against her with prejudice. In addition, the circuit court orally dismissed with prejudice all claims against Freeway Ford after Washington moved during trial to nonsuit her claims against it. However, no written



Washington asserted several claims against Ford, including negligence, strict liability, failure to warn, and breach of warranties. She asked for past and future medical expenses; past and future lost earnings; future loss of earning capacity; past and future pain and suffering; past and future mental anguish and mental harm; loss of services, society, and companionship; permanent injuries; property damage; the reasonable value of the loss of Johnny's life; and the reasonable value of funeral expenses. She also asserted a claim for punitive damages against Ford.

The case proceeded to trial on August 16, 2010, solely against Ford, and Washington alleged that the Explorer had two defects: (1) the propensity to roll over and (2) the use of tempered, rather than laminated glass, in the side windows that made ejection or partial ejection in a rollover more likely. Although Williams had been previously dismissed, the circuit court allowed her to be placed on the verdict form for apportionment purposes. After a two-week trial, the jury returned a verdict finding that both Ford and Williams, equally, had been the proximate cause of Johnny's death. The jury awarded Washington $4,652,125 in compensatory damages and $2.5 million in punitive damages, and a judgment was entered on October 6, 2010, in which the circuit court merely reproduced the jury's answers to the special interrogatories without setting forth a specific dollar amount owed by Ford.

On October 20, 2010, Ford filed a motion for judgment notwithstanding the verdict or alternatively, for a new trial, which was denied. Ford filed a timely notice of appeal, and

order to that effect was entered at that time.



Washington filed a notice of cross-appeal. This court dismissed Ford's first appeal without prejudice due to the lack of a final order because no written order had been entered dismissing Freeway Ford. *See Ford Motor Co. v. Washington*, 2012 Ark. 325 ("*Ford I*"). We then dismissed the second appeal for lack of finality because the judgment did not set forth a specific dollar amount owed by Ford. *See Ford Motor Co. v. Washington*, 2013 Ark. 88 ("*Ford II*"). Following a second remand, the circuit court entered an order on April 8, 2013, awarding judgment against Ford in the amount of $7,152,125. The court also included a nunc pro tunc provision in the order, making the judgment retroactive to October 6, 2010, the date of the original judgment, for post-judgment-interest purposes.

Ford filed a motion to alter or amend the judgment, arguing that the nunc pro tunc designation was improper; a motion for JNOV; and a motion for remittitur, arguing that the award of compensatory damages should be reduced in accordance with the jury's 50-50 allocation of fault between Ford and Williams. These motions were denied by the circuit court on April 29, 2013, and Ford filed a timely notice of appeal on May 3, 2013.

## I. *Section 27-37-703*

For its first point on appeal, Ford contends that the circuit court abused its discretion when it found that Ford had not met the requirements of Arkansas Code Annotated section 27-37-703 and prohibited Ford from introducing evidence that Johnny was not wearing a seat belt at the time of the accident. Ford maintains that it put forth sufficient proof to meet its burden under the statute. Ford also asserts that the circuit court abused its discretion in allowing Washington to present testimony that Johnny was wearing his seat belt because once

4

SLIP OPINION

Washington "opened the door," it was error not to allow Ford to rebut that evidence, even where such evidence was otherwise inadmissible.

In response, Washington argues that Ford did not meet its statutory burden and that the circuit court was correct to reject Ford's evidence suggesting that Johnny was not wearing a seat belt because it was "conjecture," "lack[ed] foundation," and was "merely conclusionary." Further, Washington asserts that Ford's "opening the door" argument is not preserved.

According to Ark. Code Ann. § 27-37-703 (Repl. 2008), which governs the admissibility of such evidence,

> (a)(1) The failure of an occupant to wear a properly adjusted and fastened seat belt shall not be admissible into evidence in a civil action.
> (2) Provided, that evidence of such failure may be admitted in a civil action as to the causal relationship between noncompliance and the injuries alleged, if the following conditions have been satisfied:
> (A) The plaintiff has filed a products liability claim other than a claim related to an alleged failure of a seat belt;
> (B) The defendant alleging noncompliance with this subchapter shall raise this defense in its answer or timely amendment thereto in accordance with the rules of civil procedure; and
> (C) Each defendant seeking to offer evidence alleging noncompliance has the burden of proving:
> (i) Noncompliance;
> (ii) That compliance would have reduced injuries; and
> (iii) The extent of the reduction of such injuries.
> (b)(1) Upon request of any party, the trial judge shall hold a hearing out of the presence of the jury as to the admissibility of such evidence in accordance with the provisions of this section and the rules of evidence.
> (2) The finding of the trial judge shall not constitute a finding of fact, and the finding shall be limited to the issue of admissibility of such evidence.

On the second day of trial, Ford filed a motion for admission of evidence of the



decedent's failure to wear a seat belt, asserting that it had met the prerequisites of section 27–37-703. Specifically, Ford put forth the deposition testimony of Dr. Robert Piziali, a mechanical-engineering and accident-reconstruction expert, who testified that there were no marks on the vehicle's restraint system consistent with belt use; that there were no marks on the decedent that were consistent with belt use; that the position of the decedent's head at the time of the injury was inconsistent with restraint use; that if the decedent had been properly restrained, his head would not have been able to exit the vehicle; and that had he been properly restrained, the decedent would not have been in a position to be killed.

To rebut Ford's evidence of seat belt nonuse, Washington presented the deposition testimony of Timothy Clowers,[2] a paramedic who had arrived on the scene of the accident and attended to Johnny. Clowers testified that "from the best of my recollection," he remembered having to undo the decedent's seat belt before tending to his injuries. When he was referred to a notation contained in the decedent's emergency-room records stating, "motor vehicle accident, unrestrained driver," Clowers stated that he did not recall telling emergency-room personnel that the decedent was or was not restrained. Clowers further stated that he could not disagree with the notation without knowing the basis for it, but that, in his experience, emergency-room personnel generally assume that a person was not restrained when the person is ejected from the vehicle. On cross-examination, Clowers said that he did not have a specific recollection of unfastening the decedent's seat belt. He also

---

[2]Clowers was deceased at the time of trial.

did not specifically recall whether the shoulder harness was positioned across the decedent's torso.

After holding a hearing on the motion out of the presence of the jury and considering this proffered testimony, as well as the parties' arguments, the circuit court ruled that Ford had not met its burden under the statute and that evidence of nonuse of the seat belt would be excluded. Thereafter, when Washington attempted to introduce the portions of Clowers's deposition testimony set out above into evidence, Ford objected "on the grounds it goes to the issue of whether Johnny Washington was belted or not." Ford argued,

FORD:  Well, plaintiff was allowed to put in proof that Johnny Washington was allowed to wear his belt. We're saying in this particular case, what the Court has indicated that Ford is not allowed to rebut that proof at this time. The plaintiff is opening the door, allowing Ford to do so. But, if the Court does not allow Ford to do so, it would be unfairly prejudiced by this evidence coming in at this time.

COURT:  – given on this very point. The reason why Ford is prohibited is Ford did not comply with the statute, and if you complied this morning with it, that's the problem. It's simple. You didn't follow the law. And the law said the defendant. It doesn't talk about – it's talking about belted. It doesn't give you any fairness argument because of that. You already know it. You're wasting my time raising this objection. Don't do it again. Objection overruled. Proceed. This point has been decided.

Our standard of review for evidentiary rulings dictates that circuit courts have broad discretion and that a circuit court's ruling on the admissibility of evidence will not be reversed absent an abuse of that discretion. *Green v. Alpharma, Inc.*, 373 Ark. 378, 284 S.W.3d 29 (2008). A circuit court abuses its discretion when it makes a decision that is arbitrary or capricious. *See Phelan v. Discover Bank*, 361 Ark. 138, 205 S.W.3d 145 (2005).

SLIP OPINION

7

There is no dispute in this case that Ford complied with section 27–37–703(a)(2)(A) and (B) of the statute, as this is a products-liability action involving a claim not related to an alleged failure of a seat belt, and the issue was raised by Ford in its answer. Instead, the issue on appeal is whether the elements relating to noncompliance, reduction in injury, and the extent of any reduction in injury, which are listed in subsection (c) of the statute, were adequately proved by Ford.

With regard to noncompliance, Ford argues that Clowers's testimony as to whether Johnny was wearing a seat belt was equivocal and that Washington did not submit any other evidence, expert or otherwise, on the issue. Ford thus argues that substantial evidence was presented of noncompliance. As to its proof of a reduction in injuries, and the extent of any such reduction, had a seat belt been worn, Ford contends that it presented sufficient evidence of these statutory elements through Dr. Piziali's deposition testimony that the vast majority of rollover accidents do not result in fatal injuries and that had Johnny been belted, he would not have been in a position to have suffered the head injury that killed him. Ford again argues that Washington failed to present any evidence to the contrary and that the circuit court abused its discretion by ruling that the evidence of seat belt nonuse was inadmissible, given Dr. Piziali's "unrefuted testimony."

In concluding that Ford had failed to meet its burden of proving that this evidence was admissible under section 27–37–703, the circuit court stated that it was troubled by the following: that many of Dr. Piziali's statements were generalizations; that while Dr. Piziali



commented about a lack of blood splatter on the seat belt, he did not indicate that there were in fact blood-splatter patterns present in the vehicle that would indicate that there could have been splatter present on the belt as well; that no evidence was presented regarding what a seat belt-restraint system should have done in a rollover scenario; that Dr. Piziali did not specify the extent of the reduction of the injuries that wearing a seat belt would have resulted in other than survival; that the court was unsure about Dr. Piziali's expertise and how it related to what normally happens to a body in a rollover accident; that Dr. Piziali seemed to rely heavily on an ER document that the injured person was not belted and disregarded the testimony of Clowers, who was an eyewitness; that there was no evidence presented on what the injuries would have been had Washington been belted; and that much of the evidence presented to the court had been statistics and generalizations rather than specific facts relevant to this case.

As noted above, this court may not overturn the circuit court's decision absent an abuse of discretion. An abuse of discretion is a high threshold that does not simply require error in the circuit court's decision, but requires that the court act improvidently, thoughtlessly, or without due consideration. *See Coker v. Coker*, 2012 Ark. 383, ___ S.W.3d ___. The circuit court in this case held a hearing on the issue, considered the evidence presented, allowed argument from both parties, and announced a fairly lengthy ruling before issuing its written order denying Ford's motion. While Ford disagrees with the weight that was given to its evidence and opines that it was sufficient to meet the statutory requirements, it was for the circuit court to determine whether the requisite showing had been made. Further, the plain wording of the statute requires that the defendant "prove" the required

9



elements to the satisfaction of the circuit court, not merely that "sufficient" or "substantial" evidence be shown, as Ford argues in its brief. Under these circumstances, we cannot find that the circuit court acted improvidently, thoughtlessly, arbitrarily, capriciously, or without due consideration in finding that Ford did not meet its burden under the statute.

Ford also argues that the circuit court abused its discretion in excluding evidence of seat belt nonuse when Washington "opened the door" to the admission of such evidence by introducing evidence that Johnny was, in fact, wearing his seat belt at the time of the accident. Although Washington asserts that Ford failed to properly preserve this argument for appeal, we disagree. As set out above, Ford objected on this basis when Washington sought to introduce Clowers's deposition testimony into evidence, and the objection was overruled by the circuit court.

In any event, we find no merit to Ford's contention that it was entitled to rebut Washington's evidence of seat belt usage once the door had been opened, regardless of whether the evidence of nonuse was inadmissible under the statute. We have recognized the propriety of "fighting fire with fire" when a party opens the door with an untruthful statement, introduces inadmissible evidence, or makes an improper closing argument. *See, e.g.*, *King v. State*, 338 Ark. 591, 999 S.W.2d 183 (1999); *Larimore v. State*, 317 Ark. 111, 877 S.W.2d 570 (1994). Also, in *Pursley v. Price*, 283 Ark. 33, 670 S.W.2d 448 (1984), a case cited by Ford in its argument, we held that the trial court did not abuse its discretion in admitting character evidence that was otherwise inadmissible under Ark. R. Evid. 404, where the plaintiff had opened the door to the rebuttal evidence by testifying to his past exemplary



conduct. In this case, the circuit court overruled Ford's objection that Washington had opened the door to the admission of evidence of seat belt nonuse, noting that Ford had not complied with the requirements in the statute and that the statute does not provide for such an exception. Because there is a statute that expressly prohibits the admission of this evidence, this case can be distinguished from other cases in which we have held that otherwise inadmissible character evidence pursuant to our rules of evidence may be admitted to "fight fire with fire." *See Pursley, supra.* We cannot say that the circuit court abused its discretion in this case, and we therefore affirm the circuit court's ruling excluding evidence of Johnny's nonuse of a seat belt.

## II. *Preemption*

For its second point on appeal, Ford argues that the circuit court erred in permitting Washington to proceed on her glazing claim because it is preempted by FMVSS 205, which expressly allows vehicle manufacturers to use tempered glass in the side windows of vehicles. Ford contends that the failure of the circuit court to dismiss this claim was legal error that warrants a new trial. Washington responds that Ford's preemption argument is waived because the jury reached its verdict on a general-verdict form. She claims that, without any indication of how the jury reached its verdict, this court must affirm the jury's findings. Alternatively, Washington contends that the federal regulation does not preempt state common-law causes of action and argues that the circuit court was correct in allowing her to present the glazing claim as a factual question for resolution by the jury.

The following facts are pertinent to this particular point on appeal. According to the

SLIP OPINION

record, vehicle manufacturers typically use one of two types of glass glazing in their vehicle windows. Tempered glazing consists of a sheet of glazing that is designed to shatter on impact into small, granular pieces. American National Standards Institute Standard Z26.1 ("ANSI Z26") at Forward. Laminated glazing consists of two or more sheets of glass held together by a layer of plastic so that, when the glass cracks or breaks, the broken glass adheres to the sheet of plastic. *Id.* FMVSS 205, which was promulgated by the National Highway Traffic Safety Administration under the authority of the Federal Safety Act, expressly provides vehicle manufacturers with a choice of installing tempered glazing or laminated glazing in side windows.

Washington's complaint alleged negligence, strict liability, failure to warn, and breach of warranty based on Ford's use of tempered glass in the Explorer. In response, Ford filed an amended answer alleging that federal law preempted Arkansas tort law or warranty law that allows for design-defect liability based on Ford's choice to use the tempered-glass option under FMVSS 205. Washington then filed a motion for partial summary judgment on the glass-glazing claim and requested that the circuit court find that the claim was not preempted by FMVSS 205. Subsequently, Ford filed its response and cross-motion for summary judgment, arguing that FMVSS 205 preempted state-law design-defect claims regarding a manufacturer's decision to use the tempered-glass option granted by federal law.

Prior to trial, the circuit court conducted a pretrial-motion hearing and heard arguments on whether FMVSS 205 preempted Washington's state-law claims. At the hearing, the court orally granted Ford's motion, ruling that FMVSS 205 preempted Arkansas law.

12

Washington then filed a motion for reconsideration, and the circuit court entered an order vacating its prior ruling and finding that Washington's "glass/glazing and containment claims were not preempted by FMVSS 205, nor do these claims expressly or impliedly conflict with the underlying purposes of FMVSS 205 or its enabling act, the National Traffic and Motor Vehicle Safety Act."

The case proceeded to trial where Washington's expert, Dr. Steven Batzer, testified that the tempered glazing used in the Ford Explorer was unreasonably dangerous because it failed to keep the decedent inside the vehicle. Dr. Batzer stated that Ford should have used laminated glazing, and that if laminated glazing had been used in the vehicle, the decedent would have survived the accident. Dr. Batzer did concede that "virtually everybody" manufacturing vehicles in 1994 used tempered glazing in the side windows and that the tempered glazing used by Ford complied with the applicable federal safety standard. The jury also heard evidence that during the vehicle's rollover, the tempered glass in the driver–side window shattered, allowing the decedent's head to become trapped between the ground and the door frame. The jury was instructed on negligence and strict liability. Both Ford and Washington accepted general–verdict forms assigning fault without special interrogatories specifying the bases for that finding. At the trial's conclusion, the jury found by a preponderance of the evidence that both Ford and Williams were at fault and had proximately caused the decedent's death.

On appeal, Ford argues that a new trial is warranted because Washington's tort claims based on the use of defective glazing are preempted by FMVSS 205. In support of its

SLIP OPINION

argument, Ford primarily relies on the South Carolina Supreme Court's decision in *Priester v. Cromer*, 736 S.E.2d 249 (S.C. 2012). *See also Noel v. Ford Motor Co.*, No. 6:11–cv–370–orl–28DAB, 2013 WL 1786637 (M.D. Fla. Apr. 26, 2013); *Morgan v. Ford Motor Co.*, 680 S.E.2d 77 (W. Va. 2009). Aside from her waiver argument, Washington asserts that her claim is not preempted, and she refers us to a number of decisions where courts have determined that a glazing claim is not preempted by federal law. *See O'Hara v. General Motors Corp.*, 508 F.3d 753 (5th Cir. 2007); *Bernal v. Daewoo Motor Am., Inc.*, No. CV09–1502 PHX–DGC, 2011 WL 2174890 (D. Ariz. June 2, 2011); *Raley v. Hyundai Motor Co.*, No. CIV-08-0376-HE, 2010 WL 528420 (W.D. Okla. Feb. 11, 2010); *Spruell v. Ford Motor Co.*, Civ. No. 07-2058, 2008 WL 906648 (W.D. Ark. Apr. 1, 2008); *Burns v. Ford Motor Co.*, Civ. No. 06-5201, 2008 WL 222711 (W.D. Ark. Jan. 24, 2008); *Lake v. Memphis Landsmen, LLC*, 405 S.W.3d 47 (Tenn. 2013); *MCI Sales and Serv., Inc. v. Hinton*, 329 S.W.3d 475 (Tex. 2010). In these decisions cited by the parties, the courts have considered the preemption issue in the wake of the Supreme Court's opinion of *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000). *See also Williamson v. Mazda Motor of Am., Inc.*, ___ U.S. ___, 131 S. Ct. 1131 (2011); *Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002).

As a threshold matter, we first address Washington's contention that Ford waived the preemption argument for purposes of appeal because the case was presented to the jury on a general-verdict form. On this point, the record reflects that the jury was instructed that it could find Ford liable based on either negligence or strict liability. In support of both claims, Washington asserted that the vehicle was defective (1) because it had an unreasonable

SLIP OPINION

propensity to roll over, or (2) because the side window was made of tempered glass. It is only the latter theory of recovery that Ford asserts should have been dismissed.

We are persuaded by Washington's waiver argument. Where the jury's verdict is rendered on a general-verdict form, it is an indivisible entity or, in other words, a finding upon the whole case. *S. Cent. Ark. Elec. Coop. v. Buck*, 354 Ark. 11, 117 S.W.3d 591 (2003). This court will not speculate on what the jury found where a general jury verdict is used. *Tyson Foods, Inc. v. Davis*, 347 Ark. 566, 66 S.W.3d 568 (2002); *Primm v. U.S. Fidelity & Guar. Ins. Corp.*, 324 Ark. 409, 922 S.W.2d 319 (1996). When special interrogatories concerning liability or damages are not requested, this court is left in the position of not knowing the basis for the jury's verdict, and this court will not question or theorize about the jury's findings. *Hyden v. Highcouch, Inc.*, 353 Ark. 609, 110 S.W.3d 760 (2003); *Esry v. Carden*, 328 Ark. 153, 942 S.W.2d 846 (1997).

Our previous opinion in *Union Pacific Railroad Co. v. Barber*, 356 Ark. 268, 149 S.W.3d 325 (2004), is pertinent to our decision here. In that case, the Barbers premised their claim of negligence on five different theories, and the jury was given a general-verdict form on which to impose liability. On appeal, Union Pacific contested the jury's findings with respect to only two of the theories supporting the claim of negligence. Applying the above-mentioned rules of law, this court declined to address Union Pacific's arguments because the jury could have fixed liability on another theory that was advanced at trial.

Similarly, in *Tyson*, *supra*, the jury was instructed on negligence, fraud, and promissory estoppel but the verdict form did not differentiate between the different types of damages

15

SLIP OPINION

that could be awarded. The verdict form in that case stated, "We the jury find for Don

Davis on his claim for damages and award damages against Tyson Foods, Inc. in the amount

of $891,660." *Tyson*, 347 Ark. at 576, 66 S.W.3d at 579. In *Tyson*, we affirmed the damage

award, holding as follows:

> The evidence was presented to the jury, and the general verdict casts no light
> on what decision the jury reached other than liability and an amount of
> damages. No further analysis may be undertaken. Special interrogatories
> concerning damages were not requested. We are left in the position of not
> knowing the basis for the jury's verdict and we will not question or theorize
> about the jury's findings. *Esry* [*v. Carden*, 328 Ark. 153, 942 S.W.2d 846
> (1997).]

*Id.* at 585, 66 S.W.3d at 581.

In the instant case, the jury could have found in favor of Washington based on the

Explorer's propensity to roll over, or it could have found that the window glazing was

defective. The jury might also have found a combination of both defects. However, because

the jury could have based its verdict solely on the rollover theory, we must affirm on this

point. This court simply cannot speculate as to how the jury arrived at its decision; thus,

Ford has failed to demonstrate prejudice resulting from the jury's consideration of the glazing

claim.[3]

---

[3]Citing *England v. Costa*, 364 Ark. 116, 216 S.W.3d 585 (2005), Ford urges this court
to presume prejudice because it raised an objection to a jury instruction referencing the
concept of preemption. However, Ford's objection was that the instruction should not be
given in isolation without additional instructions setting forth other pertinent principles of
federal regulatory law. Ford made no argument that the instruction erroneously misstated the
law, and more significantly, Ford does not challenge this instruction on appeal. Instead, the
issue presented by Ford is the contention that the circuit court erred in ruling that the glazing
claim was not preempted by FMVSS 205 and that this alleged defect could be considered by

III. *Punitive Damages*

In its third point on appeal, Ford argues that the circuit court erred in denying its motion for judgment notwithstanding the verdict on the issue of punitive damages. Ford does not argue that the punitive-damages award was excessive; rather, it argues that there was insufficient evidence in this case that it was malicious or indifferent to the consequences of its actions. It contends that mere negligence, even gross negligence, does not suffice to justify an award of punitive damages.

Our standard of review of the denial of a motion for judgment notwithstanding the verdict is the same as that for a denial of a directed-verdict motion. *Carter v. Cline*, 2011 Ark. 474, 385 S.W.3d 745. Thus, a circuit court may enter a judgment notwithstanding the verdict only if there is no substantial evidence to support the verdict and the moving party is entitled to judgment as a matter of law. *Id.*

This court has held that an award of punitive damages is justified only where the evidence indicates that the defendant acted wantonly or with such a conscious indifference to the consequences that malice may be inferred. *Stein v. Lukas*, 308 Ark. 74, 823 S.W.2d 832 (1992). An instruction for punitive damages may be given when there is evidence that a party likely knew or ought to have known, in light of the surrounding circumstances, that his conduct would naturally or probably result in injury, and that he continued such conduct in reckless disregard of the consequences from which malice could be inferred. *D'Arbonne*

---

the jury. The present case falls squarely within the holding of *Barber, supra*. We will not presume prejudice under these circumstances.

SLIP OPINION

*Constr. Co. v. Foster*, 354 Ark. 304, 123 S.W.3d 894 (2003). When this court reviews an award of punitive damages, we consider the extent and enormity of the wrong, the intent of the party committing the wrong, all the circumstances, and the financial and social condition and standing of the erring party. *Id.*

Washington argues that she presented substantial evidence of Ford's knowledge of the 1994 Explorer's rollover tendencies. We agree. She introduced evidence that Ford's engineers had recommended four solutions to the Explorer's rollover issues but that only two changes were made in order not to delay the vehicle's production date. One of Washington's experts demonstrated to the jury the effectiveness of the previously recommended modifications of widening the track width of the vehicle and installing smaller tires, both of which were technically feasible and neither of which was implemented by Ford in the 1994 model despite the recommendations of its engineers. Further, there was evidence that Ford had inadequately tested the vehicle, that it had tested the Explorer under unrealistic conditions, such as by placing sand bags on the floor instead of in the seats to lower the center of gravity, and that it had consciously disregarded the risk of rollover when it chose to sell the Explorer with the larger tires that Johnny's vehicle had installed, despite management's awareness of the risk associated with the larger tires. With regard to the glazing issue, Washington presented evidence as to the feasibility of installing properly framed laminated side windows, the minimal cost of such windows, the fact that Johnny would not have suffered fatal injuries had such glazing been installed, and the knowledge by Ford engineers as to the superiority of laminated glazing in cases of rollover.

18



Given this proof, we find that there was substantial evidence to support the jury's award of punitive damages in this case. While Ford presented evidence to refute many of Washington's allegations, that was an issue of credibility for the jury to determine. *Chavers v. Epsco, Inc.*, 352 Ark. 65, 98 S.W.3d 421 (2003). Thus, we affirm on this point.

## IV. *Compensatory Damages*

Ford argues in its fourth point on appeal that the compensatory-damages award should be reduced by 50%, pursuant to Ark. Code Ann. § 16-61-204 and -205. This case was controlled by the law governing joint and several liability, as the accident occurred prior to the passage of the Civil Justice Reform Act in 2003. When Washington settled with Williams, the other tortfeasor in this case, they signed a "Release and Settlement Agreement," which provided that any damages recoverable by Washington would be reduced to the extent of Williams's pro rata share of fault. Ford was not a party to this agreement, but it argues that pursuant to this agreement and to Ark. Code Ann. § 16-61-204, the compensatory damages awarded should have been reduced by 50%, which is the amount of fault found by the jury to be attributable to Williams. The version of section 16-61-204 (1987) in effect at the time of this case provided that

> [a] release by the injured person of one (1) joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides; but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

The release and settlement agreement in this case also stated that it was the intent of the parties to the agreement to comply with the provisions of the Uniform Contribution Among



Joint Tortfeasors Act (§ 16-61-201 et seq.), so as to provide for a reduction to the extent of the pro rata share of the released tortfeasor of the injured person's damages recoverable against all other tortfeasors.

While Ford correctly recites the law on this issue, there are other factors present here that prevent this court from ordering such a reduction in the award of compensatory damages. As Washington contends in her brief, the instructions submitted to the jury on compensatory damages stated, "If an interrogatory requires you to assess the damages of Mrs. Washington, you must then fix the amount of money which will reasonably and fairly compensate Paulette R. Washington, Terian Washington, Quinton Swygart, and the Estate for those elements of damage which you find were proximately caused by the negligence and/or manufacture, assembly, and/or sale of a defective vehicle *by Ford Motor Company*." (Emphasis added.) Although the interrogatories themselves did not limit the damages to those caused solely by Ford, Ford at no time objected to this instruction or argued that the jury instructions were inconsistent with the interrogatories. Absent evidence to the contrary, the jury is presumed to obey the instructions. *Pearson v. Henrickson*, 336 Ark. 12, 983 S.W.2d 419 (1999). There is no evidence that the jury in this case failed to follow the instructions; thus, the damages it awarded represented only those proximately caused by Ford, and no reduction of the compensatory-damages award is warranted. We therefore affirm on this point on appeal.

V. *Postjudgment Interest*

In its final point on appeal, Ford argues that the circuit court erred in its judgment entered on April 8, 2013, subsequent to this court's second dismissal of the appeal for lack of

a final judgment, because it included a provision entering the judgment nunc pro tunc to October 6, 2010, for postjudgment-interest purposes. As Ford asserts, nunc pro tunc orders are intended to make the record speak the truth, but not to make it speak what it did not speak but ought to have spoken. *Lord v. Mazzanti*, 339 Ark. 25, 2 S.W.3d 76 (1999). A court entering a nunc pro tunc order can only correct the record to make it conform to action that was actually taken, such as for clerical errors, and the court cannot modify a decree to provide action that the court, in retrospect, should have taken but did not. *Id*.

The circuit court explained in its order denying Ford's posttrial motions that it had intended to enter a final judgment on October 6, 2010, and that it intended for postjudgment interest to run from that date. However, Ford contends that this explanation fails to justify the nunc pro tunc order because the October 6, 2010 judgment was not final, regardless of what the circuit court intended, and because the matter of postjudgment interest was not a clerical error but an action that should have been taken but which the court did not in fact take.

While Washington responds by arguing that a circuit court has discretion to enter a judgment nunc pro tunc for postjudgment interest, citing *Southern Farm Bureau Casualty Ins. Co. v. Robinson*, 238 Ark. 159, 379 S.W.2d 8 (1964), an important distinction here is that the original judgment entered on October 6, 2010, was held by this court not to be a final judgment. *See Ford I, supra*. Postjudgment interest is not designed to begin accuring prior to the entry of a final judgment, as prejudgment interest may also be awarded where appropriate. The purpose of awarding postjudgment interest is to compensate judgment creditors for the

loss of money adjudged to be due them. *Glover v. Woodhaven Homes, Inc.*, 346 Ark. 397, 57 S.W.3d 211 (2001).

In *Glover*, we discussed whether the trial court's award of postjudgment interest should have been calculated from the date of the original judgment, which we had reversed and remanded in an earlier appeal for the judgment amount to be modified. We concluded in that case that the interest was properly awarded from the entry of the original judgment because the reversal amounted to nothing more than a remand for clarification on the method the trial court used to determine the damages it awarded. *Id*. We held that when a judgment is affirmed in a modified amount, the new amount draws interest from the date of the original judgment; however, when the original judgment is reversed on appeal, any new award subsequently entered by the trial court may bear interest only from the date the new judgment is entered. *Id*. We also noted in reaching our decision in *Glover* that our opinion reversing and remanding for clarification of the original judgment did not instruct the trial court to decide any new issues or hear any additional evidence. *Id*.

In the present case, we dismissed Ford's appeals in *Ford I* and *Ford II* because there remained issues to be decided by the circuit court and thus, the original judgment was not final. Because a final judgment in this case was not entered until April 8, 2013, we find that postjudgment interest should only have been awarded from that date forward. We therefore reverse and remand on this point.

One final issue that must be addressed is Washington's motion to strike a portion of Ford's argument in its reply brief, where Ford argued that Washington had waived any

objection to including Williams, as a nonparty, on the verdict form. Washington argues that this "new" argument by Ford in its reply brief is improper because it ignores and misrepresents statements by counsel at the trial and because an appellee cannot be found to have waived an argument on appeal. We agree with Ford that it was entitled to raise this argument in its reply brief in response to Washington's arguments in her brief, regardless of whether Ford's response was meritorious, and we therefore deny the motion to strike.

Affirmed in part; reversed and remanded in part; motion to strike reply argument denied.

BAKER, GOODSON, and HART, JJ., dissent.

**COURTNEY HUDSON GOODSON, Justice, dissenting.** I cannot agree with the majority's decision to affirm the circuit court's ruling to exclude evidence of seat belt noncompliance pursuant to Arkansas Code Annotated section 27-37-703 (Repl. 2008). Therefore, I must dissent.

The record reflects that on August 23, 2000, at approximately 10:30 a.m. in Pine Bluff, thirty-eight-year-old Johnny Ray Washington, the decedent, and his son, Terian, a passenger in the front seat, were traveling in a 1994 Ford Explorer when another vehicle driven by Karah Allen Williams ran a stop sign and struck the driver's side of the Explorer. As a consequence of the collision, the decedent's vehicle slid toward and over a curb, rolled over twice, and landed right-side up. As the vehicle rolled, the glass of the driver-side window shattered. The decedent's head traversed the plane of the window, and a portion of his skull was crushed by the vehicle's frame. When emergency personnel arrived at the scene, he was

SLIP OPINION

in severe distress because of his head trauma, and an ambulance transported him to Jefferson Regional Medical Center. On arrival, the decedent did not have a pulse, and he had visible and palpable massive head injuries. Blood was coming out of both ears, his nose, and his mouth. The decedent's brain tissue also protruded from both of his ears. He later died, but his son survived the accident.

On appeal, Ford argues that the circuit court abused its discretion by excluding evidence that the decedent was not wearing his seat belt at the time of the accident and that he would have survived if he had been belted. Ford contends that the circuit court's ruling that Ford had not met its burden under Arkansas Code Annotated section 27-37-703 was a prejudicial abuse of discretion that merits reversal. Specifically, Ford asserts that it sufficiently established noncompliance; that the decedent's injuries would have been reduced had he been restrained; and that the extent of such a reduction would have been significant. Ford also contends that Washington opened the door to the admission of testimony concerning nonuse by offering testimony that the decedent was belted.

The particular facts surrounding this issue are as follows. Washington filed her complaint, stating that "[a]t all times during the accident, including at the time of the rollover, [the decedent] was wearing his seat belt." In its answer to Washington's complaint, Ford specifically alleged that the "decedent failed to wear his seat belt as required by the Arkansas Mandatory Seat Belt Act, Ark. Code Ann. § 27-37-701, and that had he complied with this Act, his injuries would have been reduced." On the first day of trial, during voir dire, Ford asked jurors questions about their attitudes on seat belt use. Washington objected to this line

24


SLIP OPINION

of inquiry, and the circuit court sustained the objection. The court noted that Ford had not requested a hearing for the court to determine the admissibility of evidence concerning seat belt nonuse under section 27-37-703, and the court ruled that Ford could not broach the subject without complying with the statute.

On the second day of trial, Washington introduced excerpts from the deposition of Timothy Clowers, a paramedic who arrived at the scene of the accident but who had died before trial. In his deposition, which was read to the jury, Clowers testified that "from the best of my recollection," he remembered having to undo the decedent's seat belt before tending to his injuries. Ford objected to this testimony and argued that Washington had opened the door to seat belt evidence and that Ford would be unfairly prejudiced if it were not allowed to rebut that proof by submitting its evidence of seat belt nonuse. The circuit court overruled the objection. In further testimony, Washington's counsel referred Clowers to a notation contained in the decedent's emergency-room records stating, "motor vehicle accident, unrestrained driver." Clowers stated that he did not recall telling emergency-room personnel that the decedent was or was not restrained, but he said that this kind of information contained in medical records is typically based on facts that are reported by him. Clowers said that he could not disagree with the notation without knowing the basis for it, but he said that, in his experience, emergency-room personnel generally assume that a person was not restrained when the person is ejected from the vehicle. On cross-examination, Clowers said that he did not have a specific recollection of unfastening the decedent's seat belt. He also did not specifically recall whether the shoulder harness was positioned across the

25

decedent's torso.

Later that same day, Ford filed a motion for the admission of evidence of the decedent's failure to wear a seat belt, pursuant to section 27-37-703. In the motion, Ford requested a hearing and argued, among other things, that the deposition testimony of Dr. Robert Piziali established the prerequisites of the statute. The following day, the circuit court held a brief hearing outside the presence of the jury to address the issue of the decedent's seat belt use. Ford did not tender any witnesses but relied solely on the deposition testimony of Dr. Piziali, who concluded that the decedent was not wearing a seat belt during the accident. Ford argued that, notwithstanding the general rule that seat belt nonuse is generally inadmissible, it fulfilled the statutory requirements outlined in section 27-37-703. From the bench, the court denied Ford's motion for admission of evidence of the decedent's failure to wear a seat belt.

The sole issue is whether Ford met its statutory burden under section 27-37-703. Pursuant to subsection (a)(2)(C), Ford had the burden of proving the decedent's noncompliance; that compliance would have reduced the decedent's injuries; and the extent of the reduction of injuries. To meet this burden, Ford submitted the deposition testimony of Dr. Piziali, who is an expert in the way occupants of vehicles interact with seat belts. Dr. Piziali offered the opinion that the decedent was not restrained at the time of the accident. In reaching that opinion, Dr. Piziali examined the Ford Explorer, and he reviewed the decedent's medical records. As support for his opinion, Dr. Piziali stated that there were no marks on the restraint system and that there were no marks on the decedent's body. He



further specified, "When we say no marks on the restraint system and no marks on Mr. Washington, we're talking about the belt making marks on Mr. Washington. We didn't find that or see any evidence of that." Next, Dr. Piziali noted that there was no evidence of blood splatters on the decedent's seat belt. He submitted a report discussing evidentiary findings of numerous blood splatters throughout the vehicle, but there was a noticeable absence of blood anywhere on the seat belt. Given the amount of blood loss from the decedent's head, Dr. Piziali opined that blood would have appeared on the seat belt had the decedent been wearing it. Further, Dr. Piziali testified that the position of the decedent's head was inconsistent with restraint use. Dr. Piziali explained that, in a rollover accident, centrifugal forces will tend to move the body up and out if the person is restrained. He stated that a person's head would be pushed toward a roof rail area but would not exit the vehicle and "get . . . in the position to where he could be injured against the B pillar [of the vehicle] like Mr. Washington did." Dr. Piziali added, "[I]f Mr. Washington was belted, he couldn't end up in the position he was in when he got injured and then killed." Ultimately, Dr. Piziali concluded that one "hundred percent of physical evidence would indicate he was not restrained, and except for the mixed testimony [Clowers's testimony indicating that the decedent was restrained vs. the statement in the medical records that he was not], there's really no support for him being restrained."

As to the requirement of showing a reduction in injuries, Dr. Piziali testified that the decedent's compliance would have reduced his injuries. In his sworn testimony, Dr. Piziali concluded that "[i]f Mr. Washington had been properly restrained, it is unlikely that he would have been fatally injured." With regard to the burden of proving the extent of the reduction

SLIP OPINION

of such injuries, Dr. Piziali stated that the vehicle rolled two times, which was "not a very high number of rolls," and that "belted occupants are very well protected in rollover accidents." He said that statistically "only 0.3 or 0.4 percent . . . of belted occupants are fatally injured in rollover accidents."

My examination of Dr. Piziali's testimony leads me to conclude that the circuit court abused its discretion by excluding Ford's proffered testimony. Dr. Piziali offered cogent reasons to support his opinion that the decedent was not wearing a seat belt at the time of the accident. There were no marks on the decedent's body indicative of seat belt use. There was no blood on the seat belt although the decedent was bleeding, and there was blood elsewhere in the vehicle. Dr. Piziali testified that the decedent's head would not have exited the vehicle had he been wearing a seat belt. Furthermore, his testimony that the decedent likely would have survived the accident had he worn a seat belt suffices as evidence demonstrating both a reduction in injuries and the extent of the reduction of such injuries. Overall, Dr. Piziali's testimony tended to show that the decedent's head might not have been crushed and that he could have survived the accident if a seat belt had been in use. Without question, the difference between life and death is a considerable reduction in the extent of injury.

Moreover, Ford persuasively argues that Washington invited rebuttal by offering the testimony of Clowers that the decedent was not wearing a seat belt. This court has long held that, when a proponent opens the door to a line of questioning, the opposing party may "fight fire with fire" by introducing rebuttal evidence on that issue, even if the rebuttal evidence is not otherwise admissible. *Pursley v. Price*, 283 Ark. 33, 34, 670 S.W.2d 448 (1984). By not

permitting this testimony, the circuit court allowed Ford, on the second day of trial, to be stripped of an entire defense that had been clearly developed throughout the litigation. *See Bedell v. Williams*, 2012 Ark. 75, 386 S.W.3d 493. Also, had the jury been given the opportunity to hear this evidence, then it could have weighed Dr. Piziali's testimony against the testimony of Clowers, who had no distinct memory of whether the decedent was belted. The rank unfairness of this is palpable.

I acknowledge that the abuse-of-discretion standard is a high threshold that does not simply require error in the circuit court's decision, but requires that the circuit court act improvidently, thoughtlessly, or without due consideration. *FMC Corp., Inc. v. Helton*, 360 Ark. 465, 202 S.W.3d 490 (2005). However, our review is not meaningless, and I am convinced that an abuse of discretion occurred in this instance. The statute does not erect an insurmountable barrier to the introduction of evidence regarding nonuse of a seat belt. Instead, it merely purports to set guidelines for when nonuse is deemed relevant. I can conceive of no clearer case than the one here for the admission of evidence of seat belt noncompliance, particularly when the testimony of seat belt use was equivocal.

Nonetheless, the majority affirms the circuit court's decision to exclude Ford's evidence indicating that the decedent was not wearing a seat belt. In so holding, the majority merely parrots the circuit court's reasoning, but it does not engage in a critical analysis of the court's decision. Contrary to the circuit court's findings, Dr. Piziali did not speak in terms of generalities. He offered specific reasons outlining the facts that formed the basis of his opinion, and his opinion was supported by statistics, that Washington did not question,

indicating that the probability of death is remote in a rollover accident when an occupant is belted. Dr. Piziali did testify that blood splatter was present in the vehicle, just not on the seat belt. Although Dr. Piziali did not say what sort of injury the decedent might have sustained had he been belted, the statute does not require such exactitude. Pinpointing with precision what those injuries might have been would require pure speculation, and thus insisting on such specificity cannot be test for admissibility. The opinion that the decedent's head would not have exited the vehicle and that he would have survived had a seat belt been worn sufficed to meet the requirements of the statute. Further, Dr. Piziali did testify as to what normally happens to a body in a rollover accident. Washington did not challenge Dr. Piziali's expertise, and he was qualified as an expert in bioengineering. Although the circuit court was "troubled" by these things, the court's reasoning simply does not support the exclusion of the testimony. Without question, Ford met the requirements of the statute, and the circuit court abused its discretion by excluding the evidence.

The majority's refusal to apply our settled rule of "fighting fire with fire" is also disturbing. This rule is applied even when the rebuttal evidence is not admissible under the rules of evidence promulgated by this court. To say that the rule of fighting fire with fire does not apply to a statutory rule of evidence elevates the statutory rule to a plane higher than our own rules of evidence. I think not.

BAKER and HART, JJ., join.

*Wright, Lindsey & Jennings, LLP*, by: *Edwin L. Lowther*, *Paul D. Morris*, and *Gary D. Marts*, for appellant.

*The Duncan Firm*, by: *Phillip J. Duncan*; *Denney & Barrett, P.C.*, by: *Richard L. Denney* and *Lydia JoAnn Barrett*; and *Brian G. Brooks, Attorney at Law, PLLC*, by: *Brian G. Brooks*, for appellee.